# In the United States Court of Federal Claims

No. 13-268 C

Filed: December 16, 2013

| | |
|---|---|
| ****************************************** | Clean Water Act, 33 U.S.C. § 1344 |
| * | (permits for dredged or fill |
| DAVIS WETLANDS BANK, LLC, * | material); |
| * | Jurisdiction; |
| Plaintiff, * | Motion to Dismiss, RCFC 12(b)(1) |
| * | and 12(b)(6); |
| v. * | Regulatory instrument; |
| * | 33 C.F.R. § 332.8(o)(3) (credits |
| THE UNITED STATES, * | issued re: wetlands mitigation); |
| * | 60 Fed. Reg. 58,605-02, 58,606 |
| Defendant. * | (Nov. 28, 1995) (Federal |
| * | Guidance for the Establishment, |
| * | Use and Operation of Mitigation |
| ****************************************** | Banks). |

**Douglas E. Kahle**, Wolcott Rivers Gates, Virginia Beach, Virginia, Counsel for Plaintiff.

**Meen Geu Oh**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for Defendant.

**MEMORANDUM OPINION AND ORDER**

**BRADEN**, *Judge*.

I.   **RELEVANT FACTUAL BACKGROUND.**[1]

On November 4, 1998, Davis Wetlands Bank, LLC ("the Bank"), the United States Army Corps of Engineers ("the Army Corps"), the United States Fish & Wildlife Service ("USFWS"), and the Virginia Department of Environmental Quality ("VDEQ"), established a wetlands

---

[1] The relevant facts discussed herein were derived from the April 15, 2013 Complaint and attached exhibits: (1) Federal Guidance for the Establishment, Use and Operation of Mitigation Banks ("Ex. A"); (2) Umbrella Memorandum of Agreement Between Bank Sponsor, U.S. Army Corps of Engineers, et al. to Establish a Procedure for Compensation for Wetland Habitat Losses in Southeastern Virginia in the Davis Wetland Bank, LLC and for the Development and Use of Such Bank ("Ex. B"); (3) Site-Specific Plan for the Davis Wetland Bank, Chesapeake, Virginia ("Ex. C"); (4) a 2001 amendment to the Umbrella Agreement ("Ex. D"); (5) an August 24, 2012 email between the Bank, the Army Corps, the USFWS and the VDEQ ("Ex. E"); and a November 21, 2012 letter from William T. Walker, Chief, Regulatory Branch, Department of the Army, Norfolk District Corps of Engineers, to Mr. Douglas Davis, Davis Environmental Consultants, Inc. and Mr. Emil A. Viola, Great Dismal Swamp Restoration Bank, LLC ("Ex. F").

mitigation bank,[2] pursuant to an Umbrella Memorandum of Agreement ("Umbrella Agreement").  Compl. ¶¶ 1, 19, Ex. B.  The Umbrella Agreement "establish[ed] general provisions for the design, development, construction, use and monitoring of a compensatory wetland bank . . . and . . . a procedure for providing off-site compensation for unavoidable wetland impacts (primarily) in Southeastern Virginia."  Compl. Ex. B at 1.

On November 24, 1998, a Site-Specific Plan for the Davis Wetland Bank ("Site-Specific Plan") was implemented, that was revised on March 31, 1999.  Compl. ¶ 20 & Ex. C.  That plan required the Bank to "block[] the drainage discharge from the site to increase the hydrology" and "plant[] thousands of tree seedlings."  Compl. ¶ 28.  On September 26, 2001, the signatories amended the Umbrella Agreement.[3]  Compl. ¶ 21 & Ex. D.

Under the Final Agreement, the Bank committed to restore agricultural and forested areas to wetlands and preserve existing wetlands, as well as provide financial assurance for the Bank's performance.  Compl. ¶ 23 & Ex. B at 5.  In exchange, the Army Corps agreed to issue the Bank one wetland credit per 1.00 acre of restored cropland, 0.50 acres of restored previously-drained forest; or 7.5 acres of existing wetlands.[4]  Compl. Ex D.  The Bank could then "sell credits to third parties as compensation mitigation for unavoidable impacts to wetlands that were permitted, pursuant to Section 404 [33 U.S.C. § 1344] of the [Clean Water Act]."  Compl. ¶ 25.

The Final Agreement also required that the Bank provide the Army Corps with an annual report for seven years.[5]  Compl. Ex. C.  At the end of the first 5-year monitoring period, "the

---

[2] Federal guidelines define wetlands mitigation banking as:

> [W]etland restoration, creation, enhancement, and in exceptional circumstances, preservation undertaken expressly for the purpose of compensating for unavoidable wetland losses in advance of development actions, when such compensation cannot be achieved at the development site or would not be as environmentally beneficial.  It typically involves the consolidation of small, fragmented wetland mitigation projects into one large contiguous site.  Units of restored, created, enhanced or preserved wetlands are expressed as "credits" which may subsequently be withdrawn to offset "debits" incurred at a project development site.

Federal Guidance for the Establishment, Use and Operation of Mitigation Banks, 60 FED. REG. 58,605-02, 58,606 (Nov. 28, 1995).

[3] Hereinafter, the court will refer to the Umbrella Agreement, amendments thereto, and the Site-Specific Plan as the "Final Agreement."

[4] "The number of credits must reflect the difference between pre- and post-compensatory mitigation project site conditions, as determined by a functional or condition assessment or other suitable metric."  33 C.F.R. § 332.8(o)(3).

[5] An annual report was required for the first five years, but was extended to seven years, under the Site-Specific Plan.  Compl. ¶¶ 26–27, Ex. B at 11, & Ex. C at 4.

credit composition [would] be reevaluated and may be adjusted to reflect maturation of the restored or created wetlands." Compl. Ex. B. On October 30, 2001, the Army Corps agreed to issue the Bank 389.9 credits, "subject to the success of [the Bank's] restoration and creation efforts."[6] Compl. ¶ 39 & Ex. D.

The Army Corps, however, suspended the performance of the wetlands bank from June 16, 2006 to September 8, 2009, because of "a temporary property ownership dispute." Compl. ¶ 29. During that time, the Bank continued to monitor and report on the restoration activities and, in 2009, provided a final progress report to the Army Corps. Compl. ¶¶ 30–31.

Sometime in 2012, the Bank requested that the Army Corps issue an additional 139.5 credits to reflect the development of certain agricultural fields into mature forested wetlands. Compl. ¶ 47. On August 24, 2012, however, the Army Corps denied that request. Compl. ¶ 49, Ex. E, & Ex. F.

## II. PROCEDURAL HISTORY.

On April 15, 2013, the Bank filed a Complaint in the United States Court of Federal Claims alleging that the Army Corps' refusal to adjust credit composition to reflect the maturation of the restored agricultural fields into forested wetlands violated 33 C.F.R. § 332.8(o)(3), and breached the Final Agreement. Compl. ¶¶ 50–53. Accordingly, the Bank seeks alleged damages for the Army Corps' refusal to issue the additional 139.5 credits, in the amount of $1,395,000. Compl. ¶ 53.

On July 24, 2013, the Government filed a Motion To Dismiss. On August 23, 2013, the Bank filed a Response. On September 6, 2013, the Government filed a Reply.

## III. DISCUSSION.

### A. Jurisdiction.

The United States Court of Federal Claims has "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C.

---

[6] The total 389.9 credits consists of:

(i) 139.5 credits for planting trees and restoring hydrology to 139.5 acres of agricultural fields;

(ii) 226 credits for restoring the 113 acres of restored previously-drained forest; and

(iii) 24.4 credits for preserving 182.7 acres of existing wetlands.

Compl. ¶ 39.

§ 1491(a)(1). The Tucker Act, however, is only a "jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976). Therefore, in order to pursue a substantive right, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages for the court to have jurisdiction. *See Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act."); *see also Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc) ("The Tucker Act . . . does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages. In the parlance of Tucker Act cases, that source must be 'money-mandating.'").

> B.   Standard Of Review For A Motion To Dismiss Pursuant To RCFC 12(b)(1).

A challenge to the United States Court of Federal Claims' "general power to adjudicate in specific areas of substantive law . . . . is properly raised by a [Rule] 12(b)(1) motion[.]" *Palmer v. United States*, 168 F.3d 1310, 1313 (Fed. Cir. 1999); *see also* Rules of the United States Court of Federal Claims ("RCFC") 12(b)(1) (allowing a party to assert, by motion, "lack of subject-matter jurisdiction"). When considering whether to dismiss an action for lack of subject matter jurisdiction, the court is "obligated to assume all factual allegations of the complaint to be true and to draw all reasonable inferences in plaintiff's favor." *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995).

Nonetheless, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) ("[O]nce the [trial] court's subject matter jurisdiction [is] put in question . . . [the plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.").

> C.   Standard Of Review For A Motion To Dismiss Pursuant To RCFC 12(b)(6).

A challenge to the United States Court of Federal Claims' "[ability] to exercise its general power with regard to the facts peculiar to the specific claim . . . is raised by a [Rule] 12(b)(6) motion[.]" *Palmer*, 168 F.3d at 1313; *see also* RCFC 12(b)(6) ("Every defense to a claim for relief in any pleading must be asserted in the responsive pleading . . . . But a party may assert the following defenses by motion: . . . (6) failure to state a claim upon which relief can be granted[.]").

When considering whether to dismiss an action for failure to state a claim, the court must assess whether "a claim has been stated adequately" and then whether "it may be supported by [a] showing [of] any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 (2007). The plaintiff's factual allegations must be substantial enough to raise the right to relief "above the speculative level," accepting all factual allegations in the complaint as true and making all reasonable inferences in favor of the plaintiff. *Id.* at 555.

**D.     Issues Raised In The Government's July 24, 2013 Motion To Dismiss.**

**1.     Whether The Court Has Jurisdiction To Adjudicate Breach Of Contract Claims Arising From The Final Agreement.**

**a.     The Government's Argument.**

The Government advances two arguments in support of the Motion To Dismiss, pursuant to RCFC 12(b)(1). First, the court does not have jurisdiction to adjudicate the claims alleged in the April 15, 2013 Complaint under the Tucker Act, because the Final Agreement is not a contract. Gov't Mot. 6–8. Second, the court does not have jurisdiction, because the Final Agreement does not contemplate money damages as a remedy. Gov't Mot. 8–10.

A clear indication of intent to contract must be found before concluding a contract has been formed. Gov't Mot. 6 (citing *D & N Bank v. United States*, 331 F.3d 1374, 1378 (Fed. Cir. 2003)). The Government, however, insists that the Final Agreement was not a contract but "a regulatory instrument," the purpose of which was to "establish general provisions for the design [and] development . . . of a compensatory wetland bank[.]" Gov't Mot. 7. The Army Corps' actions to "effectuate regulatory proclamations" and "exercise the Government's sovereign function does not signify intent to contract." Gov't Mot. 6 (citing *Anderson v. United States*, 344 F.3d 1343, 1357 (Fed. Cir. 2003); *D & N Bank*, 331 F.3d at 1378).

More specifically, the Government contends that the Army Corps' role in the Final Agreement was in the nature of a regulator and supervisor, *i.e.* to verify "the geographic parameters of the proposed mitigation bank, . . . over[see] . . . the project, establish criteria that [the Bank] must follow to obtain credits, adjudge the suitability for a particular compensation proposal or compensation site, determine appropriate credit composition ratios, and generally inform [the Bank of non-compliance]." Gov't Mot. 7 (internal citations and quotations omitted). As such, the Army Corps was not a party to the Final Agreement, but the regulation. Gov't Mot. 7 (citing *Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1331 (Fed. Cir. 2012) ("The mitigation bank program is run exclusively by the [Army] Corps, subject to its pervasive control, and no landowner can develop a mitigation bank absent [its] approval.")). And, the Final Agreement is a "regulatory arrangement[]," not a contract. Gov't Mot. 8. In fact, the Government suggests that the court should view the Final Agreement as a permit. Gov't Reply 1–2 (citing *Hearts Bluff Game Ranch*, 669 F.3d at 1331 (referring to an application to establish a mitigation bank as a "permit"); *United States v. Smith*, 39 F.2d 851, 856 (1st Cir. 1930) ("In general, a license is not a contract."); BLACK'S LAW DICTIONARY (9th ed. 2009) (defining "permit" as a "license")).

Only in "exceptional circumstances" may a court construe a permit to be a contract. Gov't Reply 3 (citing *Son Broadcasting, Inc. v. United States*, 52 Fed. Cl. 815 (2000) (finding that a Special Use Permit, together with an incorporated Site Plan, concerning the development of mountaintop broadcasting towers in a national forest was a contract)). In this case, the Final Agreement, unlike a contract, limits transferability. Gov't Reply 4 (citing *Hage v. United States*, 35 Fed. Cl. 147, 166–67 (1996) (stating that nontransferability weighs in favor of finding a permit to be a license, not a contract)). The Army Corps also maintained a "unilateral right to suspend activity under the [Final Agreement]," if the Army Corps determined that the Bank did

5

not meet certain requirements. Gov't Reply 4 (citing *Hage*, 35 Fed. Cl. at 166–67). In addition, the Final Agreement affords the Army Corps "the right to inspect, oversee, penalize, and generally manage and police, while [the Bank] is given little, if any, commensurate rights and privileges." Gov't Reply 4 (citing *Meadow Green-Wildcat Corp. v. Hathaway*, 936 F.2d 601, 604 (1st Cir. 1991) (treating a permit as a contract, where the terms did not grant "some special advantage" to the Government)); *see also* Gov't Reply 5–7 (arguing that the Final Agreement includes no reciprocal obligations by the Army Corps). In other words, this is not a case where the permittee's substantial capital investments create an inference of intent to contract, because "the only security offered . . . is . . . a staggered release of credits upon approval by the [Army] Corps for [the Bank] achieving various benchmarks in the creat[ed] wetlands." Gov't Reply 7–9.

In the alternative, assuming *arguendo* that the Final Agreement is a contract, it does not contemplate the remedy of monetary damages, because the words "money" or "damage" are not included in the Final Agreement. Gov't Mot. 8 (citing *D & N Bank*, 331 F.3d at 1378 ("[T]he intent to contract . . . is implausible because none of the documents . . . mentions goodwill or the accounting treatment thereof.")). Instead, in this case, the Bank attempts to transform its demand for additional credits into a demand for money damages. Gov't Mot. 10. The only relief contemplated by the Final Agreement is "nonmonetary," namely "credit adjustments under the Disputes Resolution Clause." Gov't Reply 9. Thus, "the only relief [the Bank] can rightly seek is extra credits . . . . [and t]he proper forum for such a dispute is the district courts." Gov't Reply 10.

    b.  **The Plaintiff's Response.**

The Bank responds that the Final Agreement is an enforceable government contract and any claims arising thereunder are within the court's jurisdiction. Pl. Resp. 4 (citing 28 U.S.C. § 1491(a)(1)). The Army Corps wanted to protect ecological health and water quality. In response, the Bank agreed to "design, construct and maintain [a] wetlands bank" in exchange for mitigation credits that could be sold to third parties. Pl. Resp. 4–5. This was an "exchange of consideration between parties" memorialized in a "multi-page written agreement." Pl. Resp. 5.

The Umbrella Agreement, the Site-Specific Plan, and subsequent amendments reflect mutual obligations, rights, and responsibilities evidencing a contract. Pl. Resp. 5. For example, Section IX of the Final Agreement states that "[t]he terms and conditions of this Agreement shall be binding upon, and inure to the benefit of the parties hereto." Compl. Ex. B at 13 (Umbrella Agreement). Section IX thereof contains an integration clause, allows only written modifications, and restricts third-party claims. Pl. Resp. 5–6 (citing Compl. Ex. B at 14–15 (Umbrella Agreement)).

Irrespective of what definition one choses, the Final Agreement includes all elements of a contract. Pl. Resp. 6–7 (citing *Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1434 (Fed. Cir. 1998) (holding that an express government contract is evidenced by: mutual intent; an exchange of consideration; and lack of ambiguity in offer and acceptance); *Buchanan v. Doe*, 246 Va. 67, 72 (1993) (defining a contract as an agreement between two or

6

more persons that obligates them to do or not do a specific thing)).[7]  In this case, mutual understanding exists, because the Final Agreement sets forth the signatories' "relative rights and duties regarding future performance related to design, construction and maintenance of the wetlands bank and the credit compensation to be provided . . . in exchange for such performance."  Pl. Resp. 7.  And, Section IX(J) of the Final Agreement authorizes the signatories "to seek enforcement hereof."  Pl. Resp. 7 (quoting Compl. Ex. B at 15 (Umbrella Agreement)).

The assertion that the Final Agreement is a "regulatory pronouncement" is not supported by the cases cited by the Government.  Pl. Resp. 7 (citing *Anderson*, 344 F.3d 1343; *D & N Bank*, 331 F.3d 1374).  In *Anderson*, the United States Court of Appeals for the Federal Circuit held that the Federal Home Loan Bank Board was not a party to a contract when it issued a resolution that approved a bank merger, but instead was a regulator.  Pl. Resp. 8–9 (citing *Anderson*, 344 F.3d at 1357).  In this case, the Final Agreement does not only approve of a wetlands bank, but sets forth "a mutual and detailed agreement" and "evidences the [Army] Corps' agreement to award specific credits for specific types of wetlands restoration within the bank."  Pl. Resp. 9.  Because "the analysis in *D & N Bank* is essentially the same [as in *Anderson*] and *Anderson* relies on *D & N Bank*," that case is similarly inapposite to "the facts and agreement in the case at bar."  Pl. Resp. 9.

In addition, as the Government concedes, contracts "generally are presumed to create a substantive right to damages as a remedy."  Pl. Resp. 10 (quoting Gov't Mot. 9).  Therefore, according to the United States Court of Appeals for the Federal Circuit in *Holmes v. United States*, 657 F.3d 1303 (2011), "when a breach of contract claim is brought in the [United States] Court of Federal Claims under the Tucker Act, the plaintiff comes armed with the presumption that money damages are available, so that normally no further inquiry is required."  Pl. Resp. 12 (quoting *Holmes*, 657 F.3d at 1314).  In fact, a government contract expressly must disavow money damages to avoid this presumption.  Pl. Resp. 12 (citing *Holmes*, 657 F.3d at 1314).  Here, the Final Agreement contemplates money damages, because the Army Corps was well aware that the Bank sold the credits to third parties, and thus any breach "would inherently affect the monetary compensation [the Bank] could derive from . . . the wetlands bank."  Pl. Resp. 13.

### c. The Court's Resolution.

Common law governs the contractual relationship between a private party and the United States.  *See United States v. Winstar Corp.*, 518 U.S. 839, 871 (1996) (explaining that "ordinary principles of contract construction and breach . . . [that apply] to any contract action between private parties" govern a contract with the Government); *Perry v. United States*, 294 U.S. 330, 352 (1935) ("When the United States, with constitutional authority, makes contracts, it has rights and incurs responsibilities similar to those of individuals who are parties to such instruments.").  Accordingly, the United States Court of Appeals for the Federal Circuit has held that "jurisdiction under the Tucker Act requires the litigant to identify a substantive right for money

---

[7] The Final Agreement specifies that it is governed by and is to be construed in accordance with United States and Virginia law.  Pl. Resp. 6 (citing Compl. Ex. B at 14 (Umbrella Agreement, Section IX(G))).

damages against the United States separate from the Tucker Act itself." *See Todd*, 386 F.3d at 1094. An express contract with the Government entails the following elements:

> (1) mutuality of intent to contract;
>
> (2) lack of ambiguity in offer and acceptance;
>
> (3) consideration; and
>
> (4) a government representative having actual authority to bind United States in contract.[8]

*Anderson*, 344 F.3d at 1352; *see also Massie v. United States*, 166 F.3d 1184, 1188 (Fed. Cir. 1999) ("[A]ny agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government.").

First, contract formation requires "an objective manifestation of voluntary, mutual assent." *Anderson*, 344 F.3d at 1353 (citing RESTATEMENT (SECOND) OF CONTRACTS § 18 (1981)). In other words, there must be a "clear indication of intent to contract and the other requirements for concluding that a contract was formed." *D & N Bank*, 331 F.3d at 1378.

A good example is found in *D & N Bank*, where a Bank Board Resolution was deemed not to be a product of negotiation between the two parties, but only a memorialization of the Board's approval of a merger between D & N Bank and another thrift bank. *See* 331 F.3d at 1379; *see also Anderson*, 344 F.3d at 1357 (same). In this case, unlike *D & N Bank*, the Final Agreement indicates a clear intent by the Army Corps to contract, and imposes mutual obligations on both parties. Compl. Ex. B at 11 (Umbrella Agreement) ("Bank Sponsor shall be responsible for maintaining the Bank in perpetuity[.]"); Compl. Ex. B at 13 (Umbrella Agreement) ("The terms and conditions of this Agreement shall be binding upon, and inure to the benefit of the parties hereto[.]"); Compl. Ex. B at 13 (Umbrella Agreement) ("[T]he Corps Permit Officer will specify any contemplated multiplier [for assigning credit liabilities to projects] and a rationale for its application.").

The inquiry into whether there is a mutual intent to contract overlaps, in part, with the requirement that there be a lack of ambiguity in offer and acceptance, since a plaintiff must offer objective evidence of "the existence of an offer and a reciprocal acceptance . . . [t]o satisfy its burden to prove . . . mutuality of intent." *Anderson*, 344 F.3d at 1353; *see also* RESTATEMENT (SECOND) OF CONTRACTS § 22(1) ("The manifestation of mutual assent to an exchange ordinarily takes the form of an offer or proposal by one party followed by an acceptance by the other party or parties."). In this case, the Final Agreement contains definite terms and recites the obligations contained and acceptance manifested by the signatures from a Bank representative, a District Engineer for the Army Corps, and a representative from USFWS. The documents and exhibits that together comprise the Final Agreement were reviewed and signed by the parties over the course of several years, suggesting a negotiated arms-length process. This ongoing process,

---

[8] The Government has not argued that the Army Corps did not have authority to bind the United States in contract.

culminating in the parties signing three separate agreements, represents "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Anderson*, 344 F.3d at 1353 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 24).

As consideration for the Bank's promise to restore wetlands subject to the Final Agreement, the Army Corps promised to issue the Bank credits, each now allegedly valued at $10,000 (Compl. ¶ 51).[9] *See, e.g.*, *Smith v. Mountjoy*, 280 Va. 46, 53, 694 S.E.2d 598, 602 (2010) ("Consideration is, in effect, the price bargained for and paid for a promise. It may be in the form of a benefit to the party promising or a detriment to the party to whom the promise is made." (quoting *Brewer v. First Nat'l Bank of Danville*, 202 Va. 807, 815 (1961)). In addition, under Virginia law, the Bank's substantial remediation efforts investments are sufficient consideration for the Army Corps' promise to award marketable credits. *Id.* Therefore, the Government is mistaken in minimizing the substantial investment that the Bank has undertaken (Gov't Reply 5–7), including the set-aside of a large number of acres of land, restoration of the land, and promises of long-term maintenance of that land. *See, e.g.*, Compl. Ex. B at 11 (Long-Term Maintenance); Compl. Ex. C (Site-Specific Plan); *see also Son Broadcasting*, 52 Fed. Cl. at 824 (treating a permit and site plan to build a transmission tower as a contract, because of the plaintiff's "substantial" investment in site development).

Therefore, under the Final Agreement, the Army Corps agreed to enter into a contract with private parties to accomplish wetland restoration in exchange for issuing credits that could be sold "to third parties as compensation mitigation for unavoidable impacts to wetlands that were permitted pursuant to Section 404 [33 U.S.C. § 1344] of the [Clean Water Act]." Compl. ¶ 25; *see also* Compl. Ex. B at 1 ("The purpose of this Agreement is to establish the general provisions for . . . a compensatory wetland bank . . . . to compensate for unavoidable impacts to wetlands in advance of development actions[.]"); 60 FED. REG. at 58,608 ("The overall goal of a mitigation bank is to provide economically efficient and flexible mitigation opportunities[.]").

Contrary to the Government's assertion, the Final Agreement is not a "regulatory instrument." Gov't Mot. 7. To distinguish a regulatory proclamation from a contract, the court may examine "resolutions, forbearance letters, assistance agreements, and supervisory action agreements to see if they consist of only regulatory proclamations, or if they include additional language, which clearly manifests the government's intention to contract." *First Fed. Lincoln*

---

[9] As discussed *supra*, the Bank committed to restore agricultural and forested areas to wetlands and preserve existing wetlands, as well as provide financial assurance for the Bank's performance under the Final Agreement. Compl. ¶ 23 & Ex. B at 5. In exchange, the Army Corps would issue the Bank one wetland credit per 1.00 acre of restored cropland, 0.50 acres of restored previously-drained forest; or 7.5 acres of existing wetlands. Compl. Ex D.

Ironically, the Final Agreement requires more from the Bank than of the Army Corps, but once consideration is established, however, courts do not weigh the adequacy of that consideration. *See* WILLISTON ON CONTRACTS § 7.21 (Adequacy of consideration) ("[S]o long as the requirement of a bargained-for benefit or detriment is satisfied, the fact that the relative value or worth of the exchange is unequal is irrelevant[.]")

*Bank v. United States*, 60 Fed. Cl. 501, 503–04 (2004); *cf. Anderson*, 344 F.3d at 1358 (citing *First Commerce Corp. v. United States*, 335 F.3d 1373, 1378 (Fed. Cir. 2003). The fact that "no landowner can develop a mitigation bank absent [Army] Corps approval," does not preclude the Army Corps from contracting with a private party.[10] *Hearts Bluff Game Ranch*, 669 F.3d at 1331.

Nor is the Government correct that the absence of words such as "money" or "damage" preclude the remedy of money damages. "[I]n a contract case, the money-mandating requirement for Tucker Act jurisdiction normally is satisfied by the presumption that money damages are available for breach of contract, with no further inquiry being necessary." *Holmes*, 657 F.3d at 1314. The Government has cited no explicit language in the Final Agreement that overcomes the presumption of money damages, because none exists. To the contrary, explicit language in the Final Agreement and in communications between the parties manifests the Army Corps' intention to enter into a contractual relationship with the Bank.

For these reasons, the court has determined that it has jurisdiction to adjudicate the alleged breach of contract claims in the April 15, 2013 Complaint.

### 2. Whether The April 15, 2013 Complaint Pled A Breach Of Contract Claim.

#### a. The Government's Argument.

The Government also argues that the Bank did not sufficiently plead a breach of contract claim, requiring the court to dismiss the April 15, 2013 Complaint, pursuant RCFC 12(b)(6). Gov't Mot. 10–11. First, the Bank did not allege a contractual duty by the Army Corps to adjust credit composition. Gov't Mot. 11. The relevant provision of the Final Agreement states: "the credit composition . . . may be adjusted to reflect the maturation of the restored or created wetlands." Gov't Mot. 12 (quoting Compl. Ex. B at 11 (Umbrella Agreement); *see also* Gov't Mot. 12 (citing *Nat'l By-Prods., Inc. v. United States*, 405 F.2d 1256, 1264 (Ct. Cl. 1969) ("[F]or a government representation . . . to be binding as a contractual obligation, it must have been in the form of an undertaking rather than a mere prediction or statement of opinion or intention.")).

Second, the Government's "continued willingness to discuss an adjustment of the credit composition" cannot be construed as a breach of duty. Gov't Mot. 14 (citing Compl. Ex. F).

Third, the Bank has claimed speculative damages based on a "fair market value" of $10,000 per credit. Gov't Mot. 15 (citing *Wells Fargo Bank, N.A. v. United States*, 88 F.3d 1012, 1023 (Fed. Cir. 1996) (declining to award speculative damages). The Bank's valuation,

---

[10] In *Hearts Bluff Game Ranch*, the United States Court of Appeals for the Federal Circuit held that the Army Corps' refusal to allow the plaintiff to operate a mitigation bank was not a taking because the Army Corps' "discretionary denial of access into the Corps program cannot be a cognizable property interest." 669 F.3d at 1331. Therefore, the Government's assertion that *Hearts Bluff Game Ranch* prohibits the Army Corps from contracting with private parties to operate a mitigation bank is without merit. Gov't Resp. 7.

however, "makes the implausible assumption that [the Bank] could have sold those credits on top of the cache of credits it hasn't sold." Gov't Mot. 15 (citing Compl. ¶ 51).

### b. The Plaintiff's Response.

The Bank responds that, because the Army Corps breached its contractual duty to adjust credit composition, the suggestion that "negotiations" are ongoing is not accurate, and the damages claimed are the foreseeable loss of profits. Pl. Resp. 20, 22. The only reasonable interpretation of the Final Agreement at issue, *i.e.*, "the credit composition will be reevaluated and may be adjusted to reflect maturation" (Comp. Ex. B at 11), is that "the provision *obligates* the [Army] Corps to adjust the credit composition, if the required reevaluation reflects a different outcome than the breakdown contemplated by the parties prior to construction of the wetlands bank." Pl. Resp. 17 (emphasis in original). To interpret that text of the Final Agreement as an option within the discretion of the Army Corps "flies in the face of the entire purpose of the agreement and . . . renders the phrase meaningless surplusage." Pl. Resp. 17; *see also id.* at 16 (citing *Nat'l By-Prods.*, 405 F.2d 1256 (requiring that the text of a contract be construed in context); *United Int'l Investigative Servs. v. United States*, 109 F.3d 734, 737 (Fed. Cir. 1997) (holding that a contract must be interpreted, "as a whole and in a manner which gives reasonable meaning to all its parts" (internal quotations omitted)). Moreover, applicable federal regulations require that the wetland mitigation banks' credits reflect actual site conditions. Pl. Resp. 18 (citing 33 C.F.R. § 332.8(o)(3) ("The number of [wetland mitigation bank] credits must reflect the difference between pre- and post-compensatory mitigation project site conditions."); 60 FED. REG. at 58,612 ("The number of available credits in a mitigation bank may need to be adjusted to reflect actual conditions."). In addition, as a matter of law, Virginia courts have construed "may" as a mandatory term. Pl. Resp. 18–20 (citing *Martin v. Howard*, 273 Va. 722, 727 (2007) (construing "may" as mandatory in a statute allowing for exhumation of a body for genetic testing)).

Second, the August 24, 2012 email does not evidence ongoing negotiations, but instead the Army Corps' attempt to impose additional requirements on the Bank not included in the Final Agreement. Pl. Resp. 20–21.

Third, the amount of damages incurred by the Bank has been addressed in *Neely v. United States*, 285 F.2d 438, 443 (Ct. Cl. 1961), wherein the United States Court of Claims held that lost profits were compensable damages. *See Neely*, 285 F.2d at 443 (explaining that, in certain circumstances, "loss of [sic] anticipated profits . . . . is a recognized measure of damages"). In addition, *Wells Fargo Bank*, cited by the Government, supports the Banks' position that the loss of profits tied to the loss of credits "were foreseeable at the time the parties entered into the Agreement." Pl. Resp. 21–22 (citing *Wells Fargo Bank*, 88 F.3d at 1023).

### c. The Court's Resolution.

For a claim to survive a motion to dismiss under RCFC 12(b)(6), it must be supported by more than merely speculative factual allegations, but the court also must make all reasonable inferences in favor of the plaintiff. *See Twombly*, 550 U.S. at 555. Interpretation of a contract starts with the plain language, interpreted in light of the context, and giving "reasonable meaning

11

to all its parts." *United Int'l Investigative Servs.*, 109 F.3d at 737 (quoting *Granite Constr. Co. v. United States*, 962 F.2d 998, 1003 (Fed. Cir. 1992)).

In this case, the plain language of the Final Agreement supports the Bank's allegation (Compl. ¶ 50) that the Army Corps had a duty to fairly consider adjustments to the credit compensation. Compl. Ex. B at 11 (Umbrella Agreement) ("[A]t the end of the 5-year monitoring period . . . , the credit composition will be reevaluated and may be adjusted to reflect maturation of the restored or created wetlands."). The April 15, 2013 Complaint also alleges that the Army Corps acknowledged that the forested wetlands at issue matured. Compl. ¶¶ 45–46. Therefore, it is reasonable to infer that the Army Corps breached the Final Agreement by not fairly and reasonably considering an adjustment to the credits at that time. Of course, the underlying factual issue of whether the Army Corp acted reasonably cannot be decided on a motion to dismiss. *See, e.g.*, *TrinCo Inv. Co v. United States*, 722 F.3d 1375, 1380 (Fed. Cir. 2013) ("To avoid dismissal under [RCFC] 12(b)(6), a party need only plead . . . with facts sufficient to nudge 'claims across the line from conceivable to plausible.'" (quoting *Twombly*, 550 U.S. at 570)). Although the word "may" appears to give the Army Corps' discretion in adjusting the credit composition, that does not relieve the Army Corps from its obligation to issue credits, and the text of the Final Agreement does not state an "opinion or intention." *Cf. Nat'l By-Prods.*, 405 F.2d at 1264 ("[F]or a government representation . . . to be binding as a contractual obligation, it must have been in the form of an undertaking rather than a mere prediction or statement of opinion or intention.").

Therefore, whether the Army Corps denied the Bank's request for a credit adjustment is a factual inquiry that cannot be decided on a motion to dismiss. *See Bradley v. Chiron Corp.*, 136 F.3d 1317, 1321 (Fed. Cir. 1998) (When ruling on a motion to dismiss under Rule 12(b)(6), "factual statements in the complaint are accepted as true . . . . [and dismissal] is proper only when, on the complainant's version of the facts, the premises of a cognizable claim have not been stated."). The Complaint alleges that the August 24, 2012 email contains that denial. Compl. ¶ 49. The August 24, 2012 email states that the Army Corps does not support "issuing additional credit to the bank merely because the project . . . is an ecological success." Compl. Ex. E at 1. To the extent that the Army Corps suggested other ways in which the Bank could generate additional credits, that is beside the point. Compl. Ex. E at 1 ("Additional compensatory mitigation credits could be generated from this site through additional real estate protection."). The August 24, 2012 email evidences that the Army Corps denied the Bank's request to issue credits, and, therefore, is sufficient to overcome the Government's Motion To Dismiss.

Finally, although the Government argues that $10,000 per credit of damages (Compl. ¶ 51) is speculative, this is not grounds for dismissal.

**IV. CONCLUSION.**

For these reasons, the Government's July 24, 2013 Motion To Dismiss is denied. The court will contact the parties to convene a status conference to discuss discovery and a trial date.


**IT IS SO ORDERED.**

s/ Susan G. Braden  
**SUSAN G. BRADEN**  
**Judge**