# In the United States Court of Federal Claims

No. 13-268 C

Filed: October 31, 2014

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| | * | Clean Water Act, |
| | * | 33 U.S.C. §§ 1311(a), 1342(a), |
| | * | 1344(a), 1362(7), (12)–(14); |
| DAVIS WETLANDS BANK, LLC, | * | Tucker Act, 28 U.S.C. § 2501 |
| | * | (Statute of limitations); |
| Plaintiff, | * | Wetlands Mitigation Bank; |
| | * | 33 C.F.R. §§ 320–32, 332.3(a)(1) |
| v. | * | (General compensatory mitigation |
| | * | requirements), 332.8(o)(3) (Credit |
| THE UNITED STATES, | * | production); |
| | * | 40 C.F.R. § 230.10(d) (Restrictions |
| Defendant. | * | on discharge); |
| | * | 60 FED. REG. 58,605-02, 58,606 |
| | * | (Nov. 28, 1995) (defining |
| | * | "wetlands mitigation banking"). |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Douglas E. Kahle**, Wolcott Rivers Gates, Virginia Beach, Virginia, Counsel for Plaintiff.

**Meen Geu Oh**, United States Department of Justice, Civil Division, Washington, D.C., Counsel for Defendant.

## MEMORANDUM OPINION AND FINAL ORDER

**BRADEN**, *Judge*.

## I.     RELEVANT STATUTORY AND REGULATORY BACKGROUND.

The Clean Water Act ("CWA") prohibits the "discharge of any pollutant" into United States' waters.  *See* 33 U.S.C. § 1311(a); *see also* 33 U.S.C. § 1362(12) (defining the terms "discharge of a pollutant" and "discharge of pollutants" as "(A) any addition of any pollutant to navigable waters from any point source, (B) any addition of any pollutant to the waters of the contiguous zone or the ocean from any point source other than a vessel or other floating craft[]"); 33 U.S.C. § 1362(7)–(10) (defining "navigable waters" as "the waters of the United States, including territorial seas[,] and also defining "territorial seas[,]" "contiguous zone[,]" and "ocean").

The Army Corps and approved state agencies have authority, under the CWA, to issue permits for unavoidable discharges.  *See* 33 U.S.C. § 1311(a) (prohibiting "the discharge of any pollutant" without a permit); *see also* 33 U.S.C. § 1342(a) (stating that the Secretary of the Army, acting through the Chief of Engineers, "may issue permits . . . for the discharge of

dredged or fill material into the navigable waters"); 33 U.S.C. § 1342(b) (describing the issuance of permits through state permit programs).

A permit holder, however, is obligated to mitigate any adverse impact of an authorized discharge.   *See* 33 C.F.R. § 320.4(r) ("Mitigation is an important aspect of the review process . . . [for] permit applications. . . . Consideration of mitigation will occur throughout the permit application and review process. . . . Losses will be avoided to the extent practicable."); *see also* 33 C.F.R. § 332.3(a)(1) ("The fundamental objective of compensatory mitigation is to offset environmental losses resulting from unavoidable impacts to waters of the United States authorized by . . . permits.  The district engineer *must* determine the compensatory mitigation to be required in a . . . permit.") (emphasis added).

One form of mitigation allows a permit holder to purchase credits from a wetlands mitigation bank.[1]   *See* 33 C.F.R. § 332.3(b)(3) (permitting the purchase of credits from a sponsor); *see also* 33 U.S.C. § 1344(a) (permits for dredged or fill material); 33 C.F.R. § 320.4 (general policies for evaluating permit applications); 40 C.F.R. § 230.10(d) (restrictions on discharge); *see generally* 33 C.F.R. §§ 320–32 (Section 404 of the CWA permit application process).

---

[1] Wetlands mitigation banking is defined as:

[W]etland restoration, creation, enhancement, and in exceptional circumstances, preservation undertaken expressly for the purpose of compensating for unavoidable wetland losses in advance of development actions, when such compensation cannot be achieved at the development site or would not be as environmentally beneficial.  It typically involves the consolidation of small, fragmented wetland mitigation projects into one large contiguous site.  Units of restored, created, enhanced or preserved wetlands are expressed as "credits" which may subsequently be withdrawn to offset "debits" incurred at a project development site.

Federal Guidance for the Establishment, Use and Operation of Mitigation Banks, 60 Fed. Reg. 58,605-02, 58,606 (Nov. 28, 1995).

## II.   THE RELEVANT FACTS.[2]

### A.   Davis Wetlands Bank LLC's Final Agreement With The Army Corps Of Engineers, The United States Fish And Wildlife Service, And The Virginia Department of Environmental Quality.

On November 4, 1998, the Army Corps and Davis Wetlands Bank, LLC ("the Bank")[3] entered into an Umbrella Memorandum of Agreement ("Umbrella Agreement").  Compl. ¶¶ 1, 19; Compl. Ex. B; 5/12/14 Martin Decl. Ex. A.  On December 14, 1998, the United States Fish & Wildlife Service also signed the Umbrella Agreement.  5/12/14 Martin Decl. Ex. A.

The Umbrella Agreement "establish[ed] general provisions for the design, development, construction, use and monitoring of a compensatory wetland bank . . . and . . . a procedure for providing off-site compensation for unavoidable wetland impacts (primarily) in Southeastern Virginia."  Compl. Ex. B at 1.  The Umbrella Agreement states that an Interagency Review Team ("IRT"),[4] comprised of representatives from state and federal agencies, will oversee the Bank and any credit distributions.  5/12/14 Martin Decl. ¶ 11; 5/12/14 Martin Decl. Ex. A.[5]

---

[2] The relevant facts discussed herein were derived from: the April 15, 2013 Complaint ("Compl.") and Exhibits A–F; the Affidavits of Douglas S. Davis ("Davis Aff.)," including Davis Exhibits A–F, and Charles Wolfe ("Wolfe Aff."), including Wolfe Exhibits A–G; Declarations of Steve Martin ("Martin Decl."), including Martin Exhibits A–W, and William T. Walker, Jr. ("Walker Decl."), including Walker Exhibits A–E; the Second Affidavit of Douglas S. Davis ("Davis 2nd Aff."), including Davis Exhibits 1–8; and the Second Declarations of Steve Martin ("Martin 2nd Decl.") and William T. Walker, Jr. ("Walker 2nd Decl."), including Walker 2nd Exhibits A–B).

[3] The Bank is a corporate entity chartered to restore and preserve wetlands in exchange for wetlands credits from the Army Corps or an approved state agency.  Compl. ¶¶ 5, 10, 19.  The Bank sold these credits to permit holders as compensatory mitigation for development projects.  Compl. ¶¶ 15, 19.

[4] The IRT is also referred to as the Compensation Bank Review Team ("CBRT"). 5/12/14 Martin Decl. ¶ 11.  The court uses the term IRT in place of CBRT throughout this opinion.

[5] The "Crediting/Debiting and Accounting Procedures" section of the Umbrella Agreement contains a reevaluation requirement, providing that "*at the end of the 5-year monitoring period . . . the credit composition will be reevaluated and may be adjusted to reflect maturation of the restored or credited wetlands.*"  5/12/14 Martin Decl. Ex. A (emphasis added). In a separate section entitled "Long-Term Maintenance, Monitoring, and Corrective Action," the Umbrella Agreement provides that data in the Monitoring Reports "shall be required annually for the first five years following the end of the first growing season after the initiation of hydrology restoration and the cessation of normal agriculture or tree planting, or an alternate plan approved by the [IRT]."  5/12/14 Martin Decl. Ex. A.

On November 24, 1998, the IRT implemented a Site-Specific Plan for the Davis Wetlands Bank ("Site-Specific Plan") that was revised on March 31, 1999.[6]  Compl. ¶ 20; Compl. Ex. C; 5/12/14 Martin Decl. Ex. B.  The Site-Specific Plan required that the Bank "block[] the drainage discharge from the site to increase the hydrology" and "plant[] thousands of tree seedlings."  Compl. ¶ 28.  In particular, the Site-Specific Plan changed the credit reevaluation requirement so that, "*at the end of year five* . . . the credit composition will be reevaluated and *may be* adjusted to reflect maturation of the restored or created wetlands." 5/12/14 Martin Decl. Ex. B (emphasis added).  The Site-Specific Plan also required that "[t]he site will be monitored in years 1, 2, 3, 5, and 7[.]"  5/12/14 Martin Decl. Ex. B.

In 2000, the State of Virginia enacted a law that granted the Virginia Department of Environmental Quality ("VDEQ") authority over alterations to state waters, including wetlands. 5/12/14 Martin Decl. ¶ 30; *see* VA. CODE ANN. § 62.1-44.15:23 (West 2013) (Wetland and stream mitigation banks).  That law also authorized the VDEQ to approve or oversee mitigation banks within the State of Virginia and determine conservation credits for the state-run permit program.  Gov't Mot. 5/12/14 Martin Decl. ¶ 30.

On October 26, 2001, the Umbrella Agreement and Site-Specific Plan were amended to state that the Bank was eligible for 389.9 credits from the mitigation site and to add the VDEQ as a signatory.[7]  5/12/14 Martin Decl. ¶ 31; 5/12/14 Martin Decl. Ex. C.

The Umbrella Agreement, the amendments thereto, and the Site-Specific Plan, comprised the October 26, 2001 "Final Agreement."  *See Davis Wetlands Bank, LLC v. United States*, 114 Fed. Cl. 113, 116 n.3 (Dec. 16, 2013).  Thereunder, the Bank committed to restore agricultural and forested areas to wetlands, preserve existing wetlands, and provide a performance bond, letter of credit, or another mutually agreed upon form to the IRT.  Compl. ¶ 23; Compl. Ex. B at 5.  In exchange, the Army Corps agreed to issue the Bank one wetland credit per 1.00 acre of restored cropland; 0.50 acres of restored previously-drained forest; or 7.50 acres of existing wetlands.[8]  Compl. Ex. D.  Then, the Bank could "sell credits to third parties as compensation

---

[6] Neither the Bank's briefs, the Government's briefs, nor the accompanying affidavits, declarations, or exhibits, discuss the content of the March 31, 1999 revisions to the Site-Specific Plan.  Whether the duty to reevaluate arose five years after the November 24, 1998 execution of the Site-Specific Plan or the March 31, 1999 revision does not affect the court's analysis.

[7] Various signatories signed the amendment between September 24, 2001 and October 26, 2001, so the court has designated the date of this document with the date of the last signatory to execute the amendment, *i.e.*, the United States Fish & Wildlife Service.

[8] "The number of credits must reflect the difference between pre- and post-compensatory mitigation project site conditions, as determined by a functional or condition assessment or other suitable metric."  33 C.F.R. § 332.8(o)(3).

mitigation for unavoidable impacts to wetlands that were permitted, pursuant to Section 404 of the [Clean Water Act]." Compl. ¶ 25.[9]

### B.     Davis Wetlands Bank LLC's Failure To Comply With The Final Agreement And Ensuing Consequences.

In 1999 and 2000, the Bank submitted first-year and second-year monitoring reports respectively five and eight months late. 5/12/14 Martin Decl. ¶ 34. The Bank also did not file a third-year monitoring report, due in 2001, until April 2004. 5/12/14 Martin Decl. ¶ 34. And, the Bank never filed a fourth monitoring report, due in 2003, even after requesting an extension until 2005 to file. 5/12/14 Martin Decl. ¶¶ 33–35.

During this period, the Bank began to experience difficulty in complying with the restrictive covenant requirements on the mitigation site.[10]   5/12/14 Martin Decl. ¶¶ 36–40. Although the IRT and Mr. Steven Martin, an Army Corps representative and former Chair of the IRT, regularly reminded the Bank about these obligations, the Bank did not document that it recorded the necessary Declarations of Restrictions. 5/12/14 Martin Decl. ¶ 38. In 2005 and 2006, the IRT and Mr. Martin again tried to work with the Bank to file the Declarations of Restrictions; however, the Bank continued to fail to be in compliance with the Declarations of Restrictions. 5/12/14 Martin Decl. ¶ 40.

In the spring of 2006, "a temporary property ownership dispute" arose concerning the land. Compl. ¶ 29. Mr. Davis's partner at the Bank, used the land "as collateral for a loan he had obtained . . . and then filed for bankruptcy." 5/12/14 Martin Decl. ¶ 40; *see also* 5/12/14 Martin Decl. Ex. E. Thereafter, Mr. Davis informed the IRT that the Bank could not file the necessary restrictive covenants regarding the mitigation site, because the Bank no longer held any interest in the land. 5/12/14 Martin Decl. ¶ 40.

---

[9] Nevertheless, on October 30, 2001, the Army Corps agreed to issue the Bank 389.9 credits, "subject to the success of [the Bank's] restoration and creation efforts." Compl. ¶ 39; Compl. Ex. D. The total 389.9 credits, included:

    (i)      139.5 credits for planting trees and restoring hydrology to 139.5 acres of agricultural fields;

    (ii)     226 credits for restoring the 113 acres of restored previously-drained forest; and

    (iii)    24.4 credits for preserving 182.7 acres of existing wetlands.

Compl. ¶ 39.

[10] Declarations of Restrictions were to be "prepared and approved by the [IRT] no later than 90 days from the approval of the Site-Specific Plan[,]" to set forth "restrictive covenants . . . on all crediting phases of each bank site" concerning maintenance of the site "in perpetuity." 5/12/14 Martin Decl. Ex. B.

After June 16, 2006, the Army Corps suspended further transactions with the Bank. Compl. ¶ 29; *see also* 5/12/14 Martin Decl. ¶¶ 41–47. During this time, however, the Bank continued to monitor and report on the restoration activities. Compl. ¶¶ 30–31.

On January 12, 2007, the mitigation site land was put up for public auction. 5/12/14 Martin Decl. Ex. D. In November 2008, the Bank entered into a partnership and negotiated an agreement, so the Bank could be reinstated as a mitigation bank. 5/12/14 Martin Decl. ¶ 43–44. Thereafter, the Bank requested that the Army Corps reinstate the Bank into the mitigation bank program. 5/12/14 Martin Decl. ¶ 44.

On June 25, 2009, a final monitoring report was submitted to the Army Corps verifying that the Bank completed all restoration, creation, and monitoring work at the mitigation site and satisfied all other required performance standards. 5/12/14 Martin Decl. ¶ 45–46; 5/12/14 Martin Decl. Ex. B; 5/12/14 Martin Decl. Ex. H. At this point, the Bank was to enter a maintenance phase, the goal of which was to preserve the newly created wetlands until all of the Bank's acquired credits were sold to third parties. 5/12/14 Martin Decl. ¶ 46; 5/12/14 Martin Decl. Ex. B; 5/12/14 Martin Decl. Ex. H.

### C.   Davis Wetlands Bank LLC's Reinstatement Into The Wetlands Mitigation Bank Program.

On September 8, 2009, the IRT reinstated the Bank in the mitigation bank program, subject to certain conditions, including the submission of a final monitoring report. 5/12/14 Martin Decl. ¶ 47; 5/12/14 Martin Decl. Ex. I.[11]

On June 2 and July 16, 2010, the Bank requested that the IRT release final credits, so that restoration work on the mitigation site would be completed. 5/12/14 Martin Decl. Ex. J; 5/12/14 Martin Decl. Ex. K. On August 12, 2010, the Army Corps, responded that "all conditions required for a final credit release have been met," so the IRT could provide the Bank with the credit compensation set forth in the Final Agreement. 5/12/14 Martin Decl. Ex. M.

Nothing of note occurred between August 12, 2010 and April 30, 2012, when the Bank sent a letter to the IRT requesting a "re-evaluation of the credit composition to reflect the maturation of the restored wetlands," *i.e.*, the same compensation rate received for restoring the previously drained forested areas, or an additional 139.5 credits. 5/12/14 Martin. Decl. Ex. M.

On July 31, 2012, the Bank sent an email to Mr. Martin, who was assigned to the Bank's mitigation site, again requesting additional credits. 5/12/14 Martin Decl. Ex. N. The letter stated that "it took 13 years of tree maturation [until 2012] to restore the forested condition on the [prior croplands]" and that the Bank was entitled to compensatory credit for forested wetlands, regardless of whether the improvement took one year or 13 years. 5/12/14 Martin Decl. Ex. N.

---

[11] This reinstatement was contingent on the Bank: (1) providing proof that it acquired the mitigation site; (2) recording the Declarations of Restrictions as to the mitigation site; (3) providing a final monitoring report; (4) providing the executed agreement between Great Dismal and Davis Bank; and (5) allowing the IRT to inspect the mitigation site. 5/12/14 Martin Decl. ¶ 45; 5/12/14 Martin Decl. Ex. G.

On August 24, 2012, Mr. Martin advised that the IRT and the Army Corps would be responding. 5/12/14 Martin Decl. Ex. O.

On August 31, 2012, the Bank made a request for additional credits to a more senior member of the Army Corps, William T. Walker, Regulatory Chief (Supervisory Environmental Scientist) of the Norfolk District.  5/12/14 Martin Decl. Ex. P.  On September 27, 2012, Mr. Walker, Mr. Martin, and Mr. Davis again examined the mitigation site in response to the Bank's credit adjustment request.  5/12/14 Martin Decl. Ex. Q; 5/12/14 Walker Decl. ¶ 6.  Mr. Walker indicated that a credit adjustment could not be based solely on the age of the wetlands and that, if the wetlands were reevaluated, an overall assessment would be required.  5/12/14 Martin Decl. ¶ 58; 5/12/14 Martin Decl. Ex. Q; 5/12/14 Walker Decl. ¶¶ 8–9.

At the end of September 2012, the VDEQ rejected the Bank's request for additional credits after evaluating the site, although the Army Corps had not yet reached a formal conclusion.  5/12/14 Martin Decl. ¶ 59; 5/12/14 Martin Decl. Ex. R.

In early October 2012, Mr. Walker asked Regulatory Chiefs in the Army Corps' North Atlantic Division to determine whether the other districts had a similar experience with adjustments to credit compensation.  5/12/14 Walker Decl. ¶ 10; 5/12/14 Walker Decl. Ex. C; 5/12/14 Martin Decl. ¶ 61; 5/12/14 Martin Decl. Ex. S.

On November 21, 2012, Mr. Walker notified the Bank that the Army Corps could not change the credit composition without a functional assessment to establish that the site sufficiently was matured.  5/12/14 Walker Decl. ¶ 13; 5/12/14 Walker Decl. Ex. D.

## III.    PROCEDURAL HISTORY.

On April 15, 2013, the Bank filed a Complaint in the United States Court of Federal Claims alleging that the Army Corps' refusal to adjust the Bank's credit distribution to reflect the maturation of the restored agricultural fields into forested wetlands on the mitigation site breached the Final Agreement and violated 33 C.F.R. § 332.8(o)(3).  Compl. ¶¶ 50–53.  For this breach, the Bank seeks damages of $1,395,000.  Compl. ¶ 53.

On July 24, 2013, the Government filed a Motion To Dismiss.  On August 23, 2013, the Bank filed a Response.  On September 6, 2013, the Government filed a Reply.

On December 16, 2013, the court denied the Government's Motion To Dismiss.  *See Davis Wetlands Bank, LLC v. United States*, 114 Fed. Cl. 113, 124 (Dec. 16, 2013) (determining that "whether the Army Corps denied the Bank's request for credit adjustment is a factual inquiry that cannot be decided on a motion to dismiss").  On December 27, 2013, the Government filed a Motion For An Enlargement Of Time to Respond To Plaintiff's Complaint that the court granted on December 30, 2013.  On January 3, 2014, the Government filed an Answer.

In accordance with the court's March 26, 2014 Scheduling Order, on March 31, 2014, Plaintiff filed a Motion for Partial Summary Judgment ("Pl. Mot.") and Brief In Support ("Pl. Br.").  On May 12, 2014, the Government filed an Opposition And Cross-Motion For Summary Judgment ("Gov't Mot.").  On May 27, 2014, the Bank filed a Reply ("Pl. Reply").  On June 4,

2014, the Bank also filed a Brief In Opposition To The Government's May 12, 2014 Cross-Motion For Summary Judgment ("Pl. Resp."). On July 3, 2014, the Government filed a Reply In Support Of Its Cross-Motion For Summary Judgment ("Gov't Reply").

## IV.   DISCUSSION.

### A.   Jurisdiction.

The United States Court of Federal Claims has jurisdiction under the Tucker Act, 28 U.S.C. § 1491, "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages . . . . [T]he Act merely confers jurisdiction upon [the United States Court of Federal Claims] whenever the substantive right exists." *United States v. Testan*, 424 U.S. 392, 398 (1976).

To pursue a substantive right under the Tucker Act, a plaintiff must identify and plead an independent contractual relationship, Constitutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages. *See Todd v. United States*, 386 F.3d 1091, 1094 (Fed. Cir. 2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act . . . ."); *see also Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (*en banc*) ("The Tucker Act . . . does not create a substantive cause of action; . . . a plaintiff must identify a separate source of substantive law that creates the right to money damages. . . . [T]hat source must be 'money-mandating.'"). Specifically, a plaintiff must demonstrate that the source of substantive law upon which he relies "can fairly be interpreted as mandating compensation by the Federal Government." *United States v. Mitchell*, 463 U.S. 206, 216 (1983) (citing *Testan*, 424 U.S. at 400). And, the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence. *See Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988) ("[O]nce the [trial] court's subject matter jurisdiction [is] put in question . . . . [the plaintiff] bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence.").

Here, the Bank alleges an independent contractual relationship with the Government and breach of a contractual provision, *i.e.*, the reevaluation requirement in the Final Agreement, by the Government. Therefore, the court has determined that it has jurisdiction under 28 U.S.C. § 1491 to adjudicate the claims alleged in the April 15, 2013 Complaint.

### B.   Standing.

"[T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed

by a favorable decision." *Friends of the Earth, Inc. v. Laidlow Envtl. Serv. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

In this case, neither party addresses standing. But, the United States Supreme Court has long held that standing is jurisdictional, "inflexible[,] and without exception[.]" *Mansfield v. Swan*, 111 U.S. 379, 382 (1884). Accordingly, the court has an obligation to raise standing even though the parties, as in this case, do not address standing. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998) (holding that a court must raise standing even if the parties "are prepared to concede it[]").

In this case, the April 15, 2013 Complaint alleges that the Bank suffered a concrete and particularized injury that was actual or imminent, because the Army Corps breached the Final Agreement. This alleged breach is fairly traceable to the Government, as the Bank alleges that the Army Corps failed to comply with the reevaluation requirement, and would be redressed by the award of monetary damages sought in the Complaint. Therefore, the court has determined that the Bank has standing.

## C.     Standard Of Review For A Motion For Summary Judgment.

In this case, because both parties rely on evidence other than the April 15, 2013 Complaint, the Government's May 12, 2014 Motion must be resolved, pursuant to RCFC 56(c), instead of RCFC 12(b). On a motion for summary judgment, the moving party must establish that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See Duramed Pharms., Inc. v. Paddock Labs., Inc.*, 644 F.3d 1376, 1380 (Fed. Cir. 2011) ("Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."); *see also* RCFC 56(c). Only genuine disputes of material fact that might affect the outcome of the suit preclude entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."). The "existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id.* at 247–48. To avoid summary judgment, the nonmoving party must put forth evidence sufficient for a reasonable finder of fact to return a verdict for that party. *Id.* at 248–50.

The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (holding that the moving party must meet its burden "by 'showing'—that is, pointing out to the [trial] court—that there is an absence of evidence to support the nonmoving party's case"); *Wavetronix LLC v. EIS Elec. Integrated Sys.*, 573 F.3d 1343, 1354 (Fed. Cir. 2009) ("The moving party bears the burden of identifying those portions of the pleadings, discovery and affidavits, that demonstrate the absence of a genuine issue of material fact."). Once the moving party demonstrates the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to show the existence of a genuine issue for trial. *See Shum v. Intel Corp.*, 633 F.3d 1067, 1076 (Fed. Cir. 2010) ("If the moving party meets its burden of establishing that there is no genuine issue of

material fact and is entitled to judgment as a matter of law, then the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial.").

Trial courts must view the facts and draw reasonable inferences "in the light most favorable to the party opposing the [summary judgment] motion." *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Scott v. Harris*, 550 U.S. 372, 378 (2007) (same); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("[O]n summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.") (internal quotation marks and citations omitted). Further, all reasonable inferences and presumptions must be resolved in favor of the nonmoving party. *See Anderson*, 477 U.S. at 255; *see also Rembrandt Data Technologies, LP v. AOL, LLC*, 641 F.3d 1331, 1336 (Fed. Cir. 2011) ("[A]ll justifiable inferences [are drawn] in favor of the non-moving party[.]").

> **D.     Whether The Army Corps Of Engineers' Alleged Breach Of Contract Is Barred By The Statute Of Limitations In 28 U.S.C. § 2501.**

The Tucker Act provides that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501. "This six-year limitations period is jurisdictional and may not be waived or tolled." *FloorPro, Inc. v. United States*, 680 F.3d 1377, 1380–81 (Fed. Cir. 2012) (citing *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 136–39 (2008).

> **1.     The Government's Argument.**

The Government argues that Section 2501 "is a jurisdictional statute not subject to waiver, whether pled or not," and therefore, the April 15, 2013 Complaint "is time-barred" by 28 U.S.C. § 2501. Gov't Mot. at 21; Gov't Reply at 3. Therefore, the court does not have jurisdiction if the Bank did not file the Complaint within six years of when its claim first accrued. Gov't Mot. at 17–18; Gov't Reply at 3. A claim first accrues "on the date when all the events have occurred which fix the liability of the Government and entitle the claimant to institute an action." *Kinsey v. United States*, 852 F.2d 556, 557 (Fed. Cir. 1988).

The Final Agreement states that "the obligation to reevaluate the mitigation site arose 'at the end of year 5[.]'" *i.e.*, between November and December 2003. Gov't Mot. at 18; 5/12/14 Martin Decl. ¶¶ 19–21, 31; 5/12/14 Martin Decl. Ex. A. Although the Bank contends that "at the end of year 5" means "at the end of the monitoring period," this contradicts both the plain language of the Final Agreement and the parties' intention when the Site-Specific Plan was implemented on November 24, 1998, extending the monitoring period to seven years. Gov't Reply at 4. The Bank cannot ignore this modification, because as the Bank concedes, the Site-Specific Plan modified another provision in the Umbrella Agreement. Gov't Reply at 4–5 (citing Pl. Resp. at 3 ("The Site-Specific Plan modified the original 5 year monitoring period contemplated by the Umbrella Agreement[,] extending it to a 7 year monitoring period[.]")).

No mention, however, was made of the Army Corps' credit adjustment in 2003 or 2004, when the Bank was struggling to maintain eligibility. Gov't Mot. at 19. Consequently, two

members of the Bank mortgaged the mitigation site and defaulted on the loan, leading to the foreclosure sale of the mitigation site on January 12, 2007.  5/12/14 Martin Decl. ¶¶ 40–42; 5/12/14 Martin Decl. Ex. D; 5/12/14 Martin Decl. Ex. E.  This resulted in the Army Corps' suspension of the Bank from the mitigation bank program on June 16, 2006.  Gov't Mot. at 9, 19.

When the Bank rejoined the program in 2009, it did not request a readjustment.  Gov't Mot. at 19.  Instead, the Bank submitted a final monitoring report and received "all 'possible' credits as defined by the [Final] Agreement."  Gov't Mot. at 19 (citing 5/12/14 Martin Decl. ¶¶ 29, 50); 5/12/13 Martin Decl. Ex. L ("[A]ll conditions required for a final credit release have been met."); 5/12/14 Martin Decl. Ex. B ("[A] total of 389.9 bank credits are possible from" the mitigation site) (internal quotation marks omitted).

The Bank, however, did not file a Complaint until April 15, 2013, over "ten years after the obligation to reevaluate arose" and several years after the statute of limitations expired in 2009.  Gov't Mot. at 20.  As such, the Bank's claims accrued "at the end of year 5" in 2003, and the statute of limitations expired six years later in 2009.  Gov't Mot. at 20.  Therefore, the April 15, 2013 Complaint is untimely.

Moreover, the Bank acknowledged that, if the Army Corps conducted a reevaluation in 2003 or 2004, it "would not have entitled it to any adjustment of the credit composition."  Gov't Mot. at 20 (citing 5/12/14 Martin Decl. ¶ 49; 5/12/14 Martin Decl. Ex. K ("[I]t took *13 years of tree maturation* [or until 2012] to restore the forested condition on the [site].") (emphasis in original)).  In addition, "the information relevant to conduct a functional assessment and measure the maturation of the mitigation site is now difficult to recreate, if not impossible."  Gov't Mot. at 20.

## 2.      The Plaintiff's Response.

First, the Government waived the statute of limitations defense by failing to raise it in the January 2, 2014 Answer.  Pl. Resp. at 2; Pl. Reply at 2.  As such, the Government's statute of limitations "defense has been forfeited and cannot be raised for the first time in its Motion For Summary Judgment."  Pl. Resp. at 2; Pl. Reply at 2.

In the alternative, the Final Agreement confirms "that the reevaluation of [the Bank's] site conditions, and the potential adjustment of credits[] would occur on completion of site monitoring[,]" so that the Bank's Complaint is timely.  Pl. Resp. at 2; Pl. Reply at 2.  The revised "Site-Specific Plan modified the original 5 year monitoring period contemplated in the Umbrella Agreement, extending it to a 7 year monitoring period [.]"  Pl. Resp. at 3 (citing Compl. Ex. C at 4); Pl. Reply at 3 (same).  Therefore, the monitoring period expired in 2006 when site grading substantially was completed, not 2003 or 2004, as the Government argues.  Pl. Resp. at 3; Pl. Reply at 3.  In addition, the seven-year monitoring period did not run during the Bank's suspension from the program from 2006 to 2009.  Therefore, the final monitoring period did not end until 2009, when the Bank was reinstated in the program.  Pl. Resp. at 4; Pl. Reply at 4.  Although the Bank was successful in restoring the wetlands, "difficulties beyond [the] Bank's control subsequently developed" that led to the suspension of operations in 2006.  Pl. Resp. at 3; Pl. Reply at 3.  Because these events delayed the submission of the final monitoring report until 2009, the Army Corps' "obligation to reevaluate the site conditions could not have arisen until

2009, upon receipt of the information contained in the Final Report." Pl. Resp. at 5; *see also* Pl. Reply at 4.

In response, the Bank promptly requested additional credits after submitting a final monitoring report in 2009, but did not challenge the Army Corps' denial, because the Bank had an adequate inventory of credits, the market for credits was slow, and the Bank did not wish to incur litigation expense. Pl. Resp. at 7; Pl. Reply at 4–5.

In the spring of 2012, however, the Bank "learned of a potential opportunity for a significant sale of wetland mitigation credits . . . [and] determined that it needed to bring the pending request for additional credits forward in a more formal manner." Pl. Resp. at 7 (citing Davis 2nd Aff. ¶ 13); Pl. Reply at 5 (same). On August 24, 2012, the Army Corps denied this formal request. Pl. Resp. at 7–8; Pl. Reply at 5–6.

In addition, the Army Corps improperly relied on the "at the end of year 5" phrase in the Site-Specific Plan, because it is "inconsistent with . . . the Umbrella Agreement." Pl. Resp. at 5. The Site-Specific Plan supplemented, but did not amend, the Umbrella Agreement by providing "[d]etailed plans, specifications, monitoring regimes, and performance standards." Pl. Resp. at 6 (citing Compl. Ex. C at 4). As such, the Site-Specific Plan language is "surplusage," and "should not be allowed to override the language of the Umbrella Agreement establishing the [Army] Corps' obligation to reevaluate the site conditions at the end of the final monitoring period." Pl. Resp. at 6; Pl. Reply at 8.

Therefore, "[w]hether the [Army] Corps breached its contractual obligation to issue additional credits to [the] Bank in 2009, when the monitoring period ended, or in 2012[,] when it formally denied [the] Bank's request for additional wetland credits, this lawsuit was timely filed in 2013." Pl. Resp. at 8.

### 3.    The Court's Resolution.

The United States Supreme Court has explained that there are two types of limitations periods: (1) the affirmative defense, which "seek[s] primarily to protect defendants against stale or unduly delayed claims[]"; and (2) the "jurisdictional" defense, that "seek[s] not so much to protect a defendant's case-specific interest in timeliness as to achieve a broader system-related goal, such as facilitating the administration of claims . . . limiting the scope of a governmental waiver of sovereign immunity, . . . or promoting judicial efficiency." *John R. Sand*, 552 U.S. at 133 (internal citations omitted). A "jurisdictional" statute of limitations is "more absolute[,] . . . requiring a court to decide a timeliness question despite a waiver, or as forbidding a court to consider whether certain equitable considerations warrant extending a limitations period." *Id.* at 133–34; *see also Blueport Co., LLC v. United States*, 533 F.3d 1374, 1380 (Fed. Cir. 2008) (describing *John R. Sand* as "reaffirming that the statute of limitations for the [United States] Court of Federal Claims, 28 U.S.C. § 2501, is a jurisdictional limitation that requires *sua sponte* consideration[]"). Therefore, the Government's failure to assert the statute of limitations in the Answer is irrelevant.

As to the merits, whether the Bank's Complaint was filed within the six-year limitations period depends on when the breach of the Final Agreement accrued: "It is generally stated that a

claim 'first accrues' when all the events have occurred, which fix the alleged liability of the defendant and entitle the plaintiff to institute an action." *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (citing *Japanese War Notes Claimants Ass'n of the Philippines, Inc. v. United States*, 373 F.2d 356, 358 (Ct. Cl. 1967), *cert denied*, 389 U.S. 971 (1967) ("A claim first accrues when all the events have occurred which fix the alleged liability of the United States and entitle the claimant to institute an action.")); *see also Nager Elec. Co. v. United States*, 368 F.2d 847, 851 (Ct. Cl. 1966) (same). Therefore, the Bank must establish that the alleged breach occurred less than six years before the April 15, 2013 Complaint was filed.[12]

The Final Agreement consists of both the Umbrella Agreement and Site-Specific Plan. *See Davis Wetlands*, 114 Fed. Cl. at 120–23 (determining that the Final Agreement formed the contract between the Bank and the Army Corps). The "Operation of the Compensation Bank" section of the Umbrella Agreement states that "*at the end of the 5-year monitoring period* (or a lesser period if agreed upon by the [IRT]), the credit composition will be reevaluated and *may be adjusted* to reflect maturation of the restored or credited wetlands." Compl. Ex. B at 11 (emphasis added). The "Long-Term Maintenance, Monitoring, and Corrective Action" section of the Umbrella Agreement requires that monitoring plans and reports be submitted "annually for the first five years following the end of the first growing season." Compl. Ex. B at 11. The Site-Specific Plan, however, modified both the reevaluation requirements and monitoring provisions of the Umbrella Agreement. Compl. Ex. C at 4–8. The new reevaluation requirement provides that "*at the end of year 5* (or a lesser period if agreed upon by the IRT), the credit compensation will be reevaluated and *may be adjusted* to reflect maturation of the restored or created wetlands." Compl. Ex. C at 8 (emphasis added). The import of this change was to remove the monitoring period as the time for determining credits. The Site-Specific Plan also modified the "Performance Criteria" and "Monitoring" requirements of the Umbrella Agreement to provide that "[t]he site will be monitored in years 1, 2, 3, 5, and 7[.]" Compl. Ex. C. at 4–5. In sum, the effect of the Site-Specific Plan was that the reevaluation requirement was separate from the monitoring period.[13] And, the reevaluation requirement arose "at the end of year 5," instead of at the conclusion of the seven-year monitoring period.

---

[12] Although neither party raised the accrual suspension rule, nevertheless, the court has determined that it is not applicable in this case. The accrual suspension rule states that the "accrual of a claim against the United States is suspended, for purposes of 28 U.S.C. § 2501, until the claimant knew or should have known that the claim existed." *Young v. United States*, 529 F.3d 1380, 1384 (Fed. Cir. 2008). "For the accrual suspension rule to apply, the plaintiff must either show that the [Government] has concealed its acts with the result that plaintiff was unaware of their existence or it must show that its injury was inherently unknowable at the accrual date." *Holmes v. United States*, 657 F.3d 1303, 1317 (internal citations and quotation marks omitted). In this case, the Complaint does not allege that the Army Corps concealed any actions or that the Bank was unaware of the Army Corps' actions. *See generally* Compl. In addition, the Bank cannot establish that any alleged injury was "inherently unknowable," because the Final Agreement states that a reevaluation would occur "at the end of year 5." 5/12/14 Martin Decl. Ex. A.

[13] The monitoring requirement was tied to the "years following the completion of site grading" to "confirm compliance with the performance standards." 5/12/14 Martin Decl. Ex. B.

Although the Umbrella Agreement references the five-year monitoring period in the reevaluation requirement, it does not tie the time of reevaluation to the monitoring period. If this were the case, reevaluation requirement in the Site-Specific Plan would have referenced the new seven-year monitoring period. *Compare* 5/12/14 Martin Decl. Ex. A *with* 5/12/14 Martin Decl. Ex. B. Instead, the Site-Specific Plan removed all reference to the monitoring period in the reevaluation requirement. Therefore, to interpret the Final Agreement to tie the reevaluation requirement to the monitoring period, as urged by the Bank, is inconsistent with the plain language of the Final Agreement that states: "[A]t *the end of year 5* (or a lesser period if agreed upon by the [IRT]), the credit composition will be reevaluated and *may be adjusted* to reflect maturation of the restored or credited wetlands." Compl. Ex. C (emphasis added). The reevaluation period in the Site-Specific Plan governs the Army Corps' duty to reevaluate, and the parties modified that language to clarify that the duty arose "at the end of year 5[,]" *i.e.*, in November 2003.[14] Assuming, *arguendo*, that the Site-Specific Plan extended the reevaluation requirement to seven years, the Army Corps duty to reevaluate arose in November 2005.[15]

The Bank argues that the period should be counted from the submission of their final report in 2009 or the final denial of their request for reevaluation in 2012, but those arguments are dependent on tolling during the 2006 to 2009 suspension period. Pl. Resp. at 8. As a matter of law, however, the statute of limitations cannot be tolled during the Bank's 2006 to 2009 suspension period. *See John R. Sand*, 552 U.S. at 136 (holding that since Section 2501 is jurisdictional, it is "not susceptible to equitable tolling[]") (citing *Soriano v. United States*, 352 U.S. 270, 273–74 (1957)); *see also* attached Court Exhibit A. Therefore, the only way the Bank's April 15, 2013 Complaint could be considered timely, without tolling, is if the reevaluation requirement is tied to a seven-year monitoring period and the accrual and statute of limitations period commenced upon the 2001 Amendment to the Site-Specific Plan. Court Exhibit A. The 2001 Amendment, however, did not address the reevaluation period or the monitoring requirement; it only added the VDEQ as a signatory and stated that the Bank could be eligible for 389.9 bank credits. 5/12/14 Martin Decl. Ex. C.

Because the Bank did not file a Complaint in the United States Court of Federal Claims until April 15, 2013, as a matter of law, the six-year statute of limitations in 28 U.S.C. § 2501 bars the court from adjudicating the Bank's breach of contract claim. In any event, the Final

---

In contrast, the function of the reevaluation requirement, as provided for in the "Credits" section of the Site-Specific Plan, specifically states that process commences "at the end of year 5[.]" Compl. Ex. C.

[14] The Government argues that "the obligation to reevaluate the mitigation site arose 'at the end of year 5[,]'" *i.e.*, between November and December 2003. Gov't Mot. at 18; 5/12/14 Martin Decl. ¶¶ 19–21, 31; 5/12/14 Martin Decl. Ex. A.

[15] Even if seven-year period commenced on March 31, 1999 when the Site-Specific Plan was revised or when the site grading was substantially completed in 1999, the duty to reevaluate would have arisen at the latest in 2006. Pl. Resp. at 3. Because the statute of limitations cannot be tolled during the Bank's 2006 to 2009 suspension period, the statute of limitations would have expired in 2012, still rendering the Bank's April 15, 2013 Complaint untimely.

Agreement did not guarantee the Bank would receive any credits, only that "the credit composition will be reevaluated and *may be* adjusted[.]"  Compl. Ex. B at 11 (emphasis added).

## V.    CONCLUSION.

For these reasons, the Bank's March 31, 2014 Motion for Partial Summary Judgment is denied and the Government's May 12, 2014 Cross-Motion For Summary Judgment is granted. The Clerk is directed to enter judgment on behalf of the Government.

**IT IS SO ORDERED.**

s/ Susan G. Braden
**SUSAN G. BRADEN**
**Judge**

**Court Exhibit A**

| Event | Date | Accrual Date, If Accrual Occurs "at the end of year 5" | Date of Expiration of Statute of Limitations, If Accrual Occurs "at the end of year 5" | Accrual Date, If Seven-Year Monitoring Period | Date of Expiration of Statute of Limitations, If Seven-Year Monitoring Period | Timeliness of Complaint |
|---|---|---|---|---|---|---|
| Execution of Site-Specific Plan | 11/24/1998 | 11/24/2003 | 11/24/2009 | 11/24/2005 | 11/24/2011 | Untimely |
| Revision of Site-Specific Plan | 3/31/1999 | 3/31/2004 | 3/31/2010 | 3/31/2006 | 3/31/2012 | Untimely |
| Substantial Completion of Site-Grading | 12/31/1999 | 12/31/2004 | 12/31/2010 | 12/31/2006 | 12/31/2012 | Untimely |
| 2001 Amendment to Site-Specific Plan | 10/26/2001 | 10/26/2006 | 10/26/2012 | 10/26/2008 | 10/26/2014 | Untimely/Timely |